IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Tyrone Guinn, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 06-075-*** |
| Thomas Carroll, Marcello Rispoli, Lise | ) | |
| Merson, David Phillips, Mr. McCreanor, and | ) | |
| Mr. Gonzalez, | ) | |
| Defendants. | | |

## STATE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Thomas Carroll, Marcello Rispoli, Lise Merson, David Phillips, Michael McCreanor, and Victor Gonzalez, ("State Defendants") by and through undersigned counsel, hereby respectfully move this Honorable Court pursuant to Fed. R. Civ. P. 56(c), to enter judgment in their favor as to all claims on the following grounds:

### BACKROUND

1.      Plaintiff, Tyrone Guinn, is a 22 year old sentenced inmate in the custody of the Delaware Department of Correction. He is currently incarcerated at the Delaware Correctional Center (DCC) in Smryna, Delaware.

2.      Tyrone Guinn is presently housed in the Security Housing Unit (SHU) at the DCC. SHU is designed for offenders who have demonstrated through documented behavior that they cannot function in a general population setting. In accordance with Guinn's own testimony, his assault and disruptive behavior prompted his classification to SHU in June 2004. *See Guinn Deposition Testimony* pg. 28: 2-24; pg.29: 1-10 attached as Exhibit A.

3.      Specifically, on June 30, 2004, Guinn was standing alone in the SHU yard for recreation. While he stood on the yard, he concealed a container consisting of his feces and urine collected beforehand. As Officers Stevens and Shannon escorted another inmate, Guinn pulled out the container of human waste and threw it on the officers and the inmate as they walked pass the recreation yard. . _See Incident Report 1013325_ attached as Exhibit B. As anyone could have reasonably anticipated, the contents splattered on the passers-by. Id.

4.      As a result, Officers Shannon and Stevens secured inmate Guinn in an interview room to prevent further assault and to await action up the chain-of-command. Id. Sergeant Phillips who just finished collecting food trays and was leaving the "A" wing observed officers Shannon and Stevens securing a resistant and recalcitrant Guinn with handcuffs. Id. These officers immediately apprised Sgt. Phillips of Guinn's assault on them. Id. In turn, another officer, Kitching, sent a radio advisory to Lieutenant Rispoli to contact Building 19 as soon as possible. Id. Rispoli responded and Stevens informed him that inmate Guinn threw human waste on him and Officer Shannon as they escorted another inmate. Stevens also informed Rispoli that he sustained three cuts on his right hand while subduing Guinn. Id. Within minutes Rispoli was relieved from his post in Building 14 "A" supervising pre-trial inmates' chow and reported to Building 20.  In the meantime, Captain McCreanor, radioed Rispoli and explained that he was headed to Building 19 where the assault had taken place.

5.      As soon as practical, McCreanor, Rispoli, Phillips and Shannon escorted inmate Guinn to Building 18 to the isolation unit of tier C, lower-level cell 2 (CL2) where he awaited further disciplinary action. _Incident Report 1013325_. A nurse was called to

examine Guinn after he was placed in the CL2. No bruises, bumps, or scratches were noted. Id. In fact, Guinn testified that he was seen by a nurse after he was taken to the isolation cell in Building 18. *See Guinn Deposition Testimony* pg. 21:20-22; pg. 49: 10-12. During Guinn's confinement in CL2, he never complained about medical problems. "I didn't have no medical condition, because I didn't have no medication. So, therefore, I didn't have to ask for nothing." Id.  There Guinn remained awaiting a disciplinary hearing for the charges of Disorderly and Threatening Behavior, Assault, Possession of Dangerous Contraband, and Creating a Health, Safety or Fire Hazard. *See Incident Report 1013325* attached as Exhibit B. Ultimately, Guinn was prosecuted and convicted by a jury of assault in a detention center for throwing a container of his feces and urine on officers and another inmate on June 30, 2004.

6.      On or about February 3, 2006, Guinn began this civil rights action under 42 U.S.C. § 1983, wherein he alleges that prison officials acted with deliberate indifference to his health and safety in violation of the Eighth Amendment. (D.I. 2).

7.      Consistent with the record before the court and numerous items docketed, Defendants, prison officials file a motion for summary judgment urging this Honorable Court to enter judgment as a matter of law in their favor and against Plaintiff.

**STANDARD OF REVIEW**

8.      A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to judgment

as a matter of law." FED.R. CIV.P. 56(C).Where the moving party produces an affidavit or other sufficient evidence of facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party assumes the initial burden to identify evidence that demonstrates the absence of a genuine issue of material fact. *Walters ex rel. Walters v. General Motors, Corp.*, 209 F. Supp.2d 481, 484 (W.D.Pa 2002). Once the moving party meets its burden, then the burden shifts to the non-moving party to demonstrate material issues of fact. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The non-moving party must set forth "specific facts showing that there is a genuine issue for trial ⋯" or the factual record will be taken as presented by the moving party and judgment will be entered against the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-moving party may not rest upon mere denials of the facts identified by the moving party, nor upon the vague argument that the record contains facts sufficient to support its claims. *Childers v. Joseph*, 842 F.2d 689 (3d Cir. 1987). Moreover, the non-moving party may not obviously substitute the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Instead, the non-moving party must point out in the summary judgment record evidence that creates a genuine issue of material fact. *See Celotex Corp. v. Catrett*. When disposing of a motion for summary judgment, in addition to the evidence the parties present, a court may consider facts of which it can take judicial notice. *United States v. Weber*, 396 F.2d

381, 386, n.10 (3d Cir. 1968) ("This Circuit has taken the position that under F.R.Civ.P. 56 a court may take judicial notice of its own public records containing sworn testimony, affidavits and similar material described in F.R.Civ.P . 56 (c).").

## Argument

### A. GUINN'S PRISON CONDITIONS CLAIM

9.      It is now well settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) citing, *Helling v. McKinney*, 509 U.S. 25, 35 (1993).  Supreme Court cases have held that officials violate the Eighth Amendment only when two (2) requirements are met.  First, the deprivation alleged must be objectively "sufficiently serious," *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); a prison official's acts or omission must result in the denial of "the minimal civilized measure of life's necessities," *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Second, to violate the cruel and unusual punishment clause, a prison official must have a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 302-303.  The sufficiently culpable state of mind has routinely been denoted as deliberate indifference to deprivation of the victim's constitutional rights. *Wilson v. Seiter, Farmer v Brennan, Estelle v. Gamble*, 429 U.S. 97 (1976).

10.      To satisfy the objective prong, plaintiff must allege that he is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. at 834. In order to establish serious harm, conditions of confinement must "have a mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth, or exercise," and "[n]othing so amorphous as 'overall conditions' can rise

to the level of [such a violation] when no specific deprivation of a single human need exists." *Blizzard v. Watson*, 892 F. Supp. 587, 598 (D. Del.1995) (citing *Wison v. Seiter*, 501 U.S. at 303-304). Although plaintiff alleges that he was placed in isolation for 14 days "depriving me of human basic needs," the logbook entries demonstrate that during plaintiff's confinement he was provided food and shelter daily, routine medical visits, clean bedding, a time to exercise and a shower. *See Logbook Entries for Tier C, Bldg. 18 June 30 through July 16, 2004* attached as Exhibit C. Indeed, plaintiff was placed on pre-hearing detention when his presence became a threat to the staff and inmate safety, and the security and orderly operation of the institution. *See Guinn Deposition Testimony* pg. 28: 2-24; pg.29: 1-10. Plaintiff's conduct on June 30, 2004, warranted his placement in a cell with limited furnishings in an area isolated from the general population housing. The fact is that plaintiff concealed a container with his feces and urine, and threw the contents on officers and another inmate as they passed by him on the yard.

11.     Moreover, the instant complaint against the defendants fails as the defendants were not deliberately indifferent to plaintiff's plight.  The defendants conduct during this time period does not imply the deliberate indifference requisite which is needed for an Eighth Amendment claim.  In essence, deliberate indifference is established only if plaintiff alleges and proves that defendants knew he faced a substantial risk of serious harm and that they disregarded that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. 825 at 837.  In other words, the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Id.

12.     The record before this court is devoid of factual evidence that any of the

defendants acted with deliberate indifference or failed to provide plaintiff "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. at 832. As evident by plaintiff's own testimony, he received food every day. He received medical care when he was placed in the isolation unit, and he was visited by medical staff on a regular basis. In addition, the institution logbook entries for Building 18, C-tier, where plaintiff was confined, corroborates serving of inmate meals and medical visits. Furthermore, the entries reflect plaintiff's access to shower, outside exercise, and times when such items as laundry and mail were delivered. See Exhibit C, bates stamped ## 639, 640, 641, 646, 650, and 651. Plaintiff has provided no evidence from which a fact finder could conclude that State defendants both were aware of a substantial risk to inmate health or safety and then affirmatively disregarded this risk. To the contrary, the logbook entries maintained by staff on all shifts of every day inform the State Defendants that plaintiff was receiving meals, laundry, exercise, and attending to his personal hygiene. Id.

13.    Plaintiff's claim that he was caused to experience some discomfort due to cold conditions in his cell for fourteen days equally fails to rise to the level of a constitutional violation. "The Constitution does not mandate comfortable prisons." *Blackitston v. Vaughn*, No. 95-3740, 2002 U,S, Dist. LEXIS 16261, at *8 (E.D. Pa. Aug. 19, 2002) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Plaintiff's only claim is associated with his displeasure at the cell temperature. However, despite the complained of conditions, Plaintiff never sought medical treatment for temperature-related conditions. Plaintiff's mere allegation of discomfort does not meet the requirements for a claim of cruel and unusual punishment.

14.    According to Guinn's sworn statement, and the pleadings on file, Defendants

show that there is no genuine issue as to any material fact, and Defendants are therefore entitled to judgment as a matter of law under FED.R.CIV.P.56(c).

**B. NO PERSONAL INVOLVMENT OR RESPONDEAT SUPERIOR LIABILITY**

15.    Plaintiff's claim against Warden Carroll does not demonstrate any personal involvement by him. *Bracey v. Grenoble*, 494 F.2d 566 (3d Cir. 1974). Cleary it is Plaintiff's burden to identify how Warden Carroll participated in, directed, or acquiesced to the events of the plaintiff complaint.  *Gay v. Petscok*, 917 F.2d 768, 771 (3d. Cir. 1990).  In this case, plaintiff fails to meet his burden. He has not identified any involvement by Warden Carroll. He merely makes general allegations in his statement of claim that "Warden Carroll, he's the warden of the institution. Anything that goes on in the institution, you know what I mean, is under his control. I'm suing him because he provided his officers without ordinary training and skill within the DOC policies, … ." <u>See Guinn Deposition Testimony</u> pg. 41: 8-17. Clearly, plaintiff merely alleges Warden's supervisory function. However, he does not identify how Warden Carroll violated any of his constitutional rights.

16.    The Third Circuit Court of Appeals has held that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." *Rode v. Dellarciprete*, 846 F.2d 1195, 1207 (3d Cir. 1988); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Personal involvement can be established through allegations of either personal direction or actual knowledge and acquiescence; however, such allegations must be made with particularity. *See Rode*, 845 F.2d at 1207.

17.    Plaintiff does not allege in his complaint that Warden Carroll had a direct role

with his placement in the isolation on pre-hearing detention for a period of 14 days. Aside from the fact that Warden Carroll has supervisory capacity over Department personnel, Plaintiff offers nothing to demonstrate that he participated in or approved of a risk to his health or safety.

18.     Given Plaintiff's silence for nearly 19 months concerning the alleged condition of his confinement in the isolation cell, he cannot now show that Defendants displayed deliberate indifference. Certainly, Plaintiff's complaint nowhere presents sufficient facts to support a determination that Defendant Carroll showed deliberate indifference to any particular harm, or that he acted with indifference to an obvious risk of harm created by Plaintiff's placement in pre-hearing detention.  Plaintiff's efforts to impose a supervisor liability claim under the Eighth Amendment are insufficient. *See, e.g., C. H. ex. rel. Z.H. v. Oliva*, 226 F.3d 198, 201-02 (3d. Cir. 2000) (en banc) ("It is, of course, well established that a defendant in a civil rights case cannot be held responsible for a constitutional violation which he or she neither participated in nor approved."). Indeed, in order to establish supervisory liability, any misconduct of the correction officers must be "affirmatively linked" to the actions or inactions of the Administrative Defendant. *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).

**C.     PLRA FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES**

19.     Defendants contend that dismissal of Plaintiff's claims is appropriate because he has failed to exhaust his administrative remedies. Prisoners are required to exhaust all administrative remedies before initiating a lawsuit pursuant to 42 U.S.C. § 1983. *See* Prison Litigation Reform Act (PLRA), 42 U.S.C. Section 1997e.  Indeed, this action is subject to the exhaustion requirements set forth in §1997e (a) which states in pertinent

part

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (2003).

*See, Booth v. Churner*, 206 F.3d 289, 300 (3d Cir. 2000), <u>cert granted</u>, 531 U.S. 956 (2000) <u>aff'd</u>, 121 S. Ct. 1819 (2001); *see also*, *Ahmed v. Sromovski*, 103 F. Supp.2d 838, 843 (E.D. Pa. 2000) (quoting *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000) (stating that § 1997e(a) "specifically mandates that inmate-plaintiffs exhaust their available administrative remedies").

20.    In the instant case, Plaintiff cannot show that he exhausted any available administrative remedy with regard to his allegations that State Defendants deprived of humane living conditions. The Plaintiff did not exhaust administrative remedies available for his grievance which described the deprivation of life necessities for which he now complains. On July 2, 2004, plaintiff filed a grievance case #4878, alleging that he was placed in isolation "stripped of his clothing, etc." *See Guinn Deposition Testimony Trnscpt. Exhibit* 6. In response to that grievance, in the appropriate time allowed for responding, defendant Lise Merson informed plaintiff that his complaint involved a disciplinary action that provided a separate and distinct appeal process that he must follow. Id. *See Guinn Deposition Testimony* pg. 40: 9-24; 41: 1-3. Defendant Merson advised plaintiff that the Bureau of Prisons procedure 4.4 did not apply to his situation and that he needed to follow the procedures set forth for inmate disciplinary matters. Plaintiff did not take the appropriate steps to appeal his disciplinary action as available.

Clearly, Plaintiff cannot offer genuine evidence to demonstrate that he exhausted available remedies prior to filing this action. It is therefore "beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

**D.     DEFENDANTS' IMMUNITY FROM LIABILITY**

21.     Furthermore, defendants are entitled to qualified immunity. A public official is entitled to qualified immunity if the officials "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Good v. Dauphin County Soc. Servs. For Children and Youth*, 891 F.2d 1087, 1092 (3d Cir.1989). As the facts as alleged by plaintiff do not show that the officials' conduct violated plaintiff's constitutional right, the officers are entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Even assuming, for the purpose of dispute, plaintiff's factual allegations could allege a constitutional violation, the court must then consider whether the right was clearly established. Id. To determine whether a right is clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The "inquiry must be undertaken in light of the case's specific context, not as a broad general proposition." *Saucier*, 533 U.S. at 201-202.

22.     Instantly, plaintiff alleges that he was deprived of basic human needs while he was confined in isolation for 14 days on pre-hearing detention. However, the institutional records which detail the plaintiff's housing while in isolation reflect that plaintiff received meals, laundry, exercise, and attention to his personal hygiene. *See Exhibit C*.  As a result, a reasonable person in the Defendants' position would have

understood that plaintiff was receiving at least "the minimal civilized measure of life's necessities."

23.     To the extent that plaintiff attempts to hold defendants liable in their individual capacities for alleged tortious acts, the State Tort Claims Act shields these defendants as they clearly acted without gross or wanton negligence; their actions arose out of, and in connection with, performance of official discretionary duties.  10 Del. C. §4001.

24.     Defendants are also immune from liability under the Eleventh Amendment.  The Eleventh Amendment stands "for the constitutional principle that State sovereign immunity limit[s] the federal courts' jurisdiction under Article III." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55 (1996). The United States Congress can waive the state's sovereign immunity, and therefore, its Eleventh Amendment immunity through the Fourteenth Amendment; however, only a clear indication of Congress' intent to waive the states' immunity will produce this result.  Id.  No such clear intent can be seen in 42 U.S.C. §1983.  In fact, Congress' intent appears to be to the contrary as the statute facially allows suits only to be brought against "persons."  42 U.S.C. §1983.  In this case, plaintiff seeks money damages against state employees for conduct during the course of their employment with the Department of Correction. Therefore, Eleventh Amendment immunity applies to the state officials.

WHEREFORE, for the hereinabove listed reasons, Defendants request this Court enter an order for summary judgment in favor of defendants and against plaintiff.

January 16, 2007                              STATE OF DELAWARE

DEPARTMENT OF JUSTICE


 _/s/ Ophelia M. Waters__
Ophelia M. Waters, I.D. #3879
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th floor
Wilmington, DE 19801
(302) 577-8400
Attorney for State Defendants

## <u>CERTIFICATE OF MAILING AND/OR DELIVERY</u>

The undersigned certifies that on or before January 16, 2007, she caused

The Memorandum in Support State Defendants' Motion for Summary Judgment to be

delivered to the following person(s) in the form and manner indicated:

**NAME AND ADDRESS OF RECIPIENT(S):**

Tyrone Guinn, Inmate
SBI # 375731
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE  19977

**MANNER OF DELIVERY:**

  X    Two true copies by first class mail, postage prepaid, to Tyrone Guinn.

      /s/ Ophelia M. Waters
Ophelia M. Waters, ID #3879
Deputy Attorney General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400

# EXHIBIT A

Page 1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

TYRONE GUINN,                                )
                                             )
            Plaintiff,                       )
                                             ) Civil Action No.
v.                                           ) 06-0075 KAJ
                                             )
MARCELLO RISPOLI, et al.,                    )
                                             )
            Defendants.                      )

            Deposition of TYRONE GUINN taken pursuant to
notice at the Delaware Correctional Center, 1181 Paddock
Road, Smyrna, Delaware, beginning at 9:00 a.m. on
November 17, 2006, before Vincent J. Bailey, Registered
Professional Reporter and Notary Public.

APPEARANCES:

            OPHELIA WATERS, ESQ.
            DEPARTMENT OF JUSTICE
              820 N. French Street
              Wilmington, Delaware  19801
              For the Defendants

                    WILCOX & FETZER
        1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Page 2

1           TYRONE GUINN,
2       the deponent herein, having first been
3       duly sworn on oath, was examined and
4       testified as follows:
5            EXAMINATION
6   BY MS. WATERS:
7       Q. Mr. Guinn, my name is Ophelia Waters. I'm a
8   deputy attorney general. Again, the reason we are here
9   today is to take your deposition. You have gotten notice
10  of the deposition for today?
11      **A. Yes.**
12      Q. During this deposition the purpose is to get your
13  oral statements and examination, your sworn testimony.
14  All the information that we provide and statements that
15  we give are going to be recorded by the stenographer.
16      **A. Yes.**
17      Q. So what I'm going to ask is that we talk in turn,
18  I ask you questions, you answer my questions, so that we
19  are not talking over each other --
20      **A. I understand.**
21      Q. -- because it is being recorded.
22      **A. Right.**
23      Q. I'm going to assume that you understand the
24  questions that I ask. If you answer the question and you

Page 3

1   don't ask me to repeat them, if you don't ask me to
2   repeat, I'll assume you understand.
3           Let me ask you: Do you read and write
4   English?
5       **A. Yes, ma'am.**
6       Q. Let me ask: Are you under the influence of any
7   sort of medication or drugs today?
8       **A. No, ma'am.**
9       Q. Will you state your full name for the purpose of
10  this deposition?
11      **A. Tyrone Henry Guinn.**
12      Q. Can you tell us what your date of birth is?
13      **A. 11-12-84.**
14      Q. Mr. Guinn, what is your highest level of
15  education?
16      **A. I have no clue right now. I don't know right**
17  **now.**
18      Q. Did you graduate from high school?
19      **A. No, ma'am.**
20      Q. What's the highest grade you completed in school?
21      **A. 10th grade.**
22      Q. Are you taking any educational classes while you
23  are here?
24      **A. No.**

Page 4

1       Q. None?
2       **A. No.**
3       Q. Okay. When were you admitted to Delaware
4   Correctional Center? Admission date?
5       **A. 11-12-84 -- I think 2002.**
6       Q. You are currently a sentenced inmate?
7       **A. Yes.**
8       Q. What's your length of sentence?
9       **A. Excuse me?**
10      Q. Your length of your sentence in terms of years,
11  months, days?
12      **A. I got like 10 months left on this case, so it**
13  **will be 2007, October 7th.**
14      Q. That's your release date?
15      **A. Yes.**
16      Q. The charges that you are in for?
17      **A. For assault, assault of a CO, officer.**
18      Q. Where are you currently housed?
19      **A. I'm housed in Building 20, SHU 19, A tier.**
20      Q. SHU 19?
21      **A. Yes.**
22      Q. Building 20?
23      **A. Yes, A tier.**
24      Q. Are you currently doing any work? Are you

Page 5

1   working? Do you have employment history?
2       **A. Not at this current time. This is max security**
3   **back here, max security.**
4       Q. Now, prior to your arrest did you work?
5       **A. Yes, I did.**
6       Q. Where did you work?
7       **A. Daycare center, I think Head Start down in**
8   **Captain Green, Dover, Delaware.**
9       Q. How long?
10      **A. That was like '99, October '99.**
11      Q. That would be the last time you worked outside?
12      **A. Yes.**
13      Q. What did you do there?
14      **A. Just like maintenance man, clean up, mop, things**
15  **of that kind.**
16      Q. You filed this lawsuit and you filed, you asked
17  the Court for a forma pauperis status?
18      **A. Yes.**
19      Q. What is your source of income, if it was
20  determined that you had a average daily balance?
21      **A. Average balance -- I receive monthly fees from my**
22  **parents, like $25, $50 a month. I might get some like**
23  **other cash from like resident family, like friends,**
24  **things of that nature.**

2 (Pages 2 to 5)

Guinn
Tyrone Guinn

v.
C.A. # 06-0075 KAJ

Rispoli, et al.
November 17, 2006

Page 6

1    Q.  You filed this lawsuit that we are here today on
2    in February 3 of this year?
3    A.  Yes.
4    Q.  Okay.  Now, let me take you back for a moment,
5    because I looked over your complaint that you filed, in
6    January -- this lawsuit dates back to 2004.  Is that
7    correct?
8    A.  Yes, June.
9    Q.  In January 2004, particularly on January 17,
10   2004, you lived in Building 17?
11   A.  No.  It was June.
12   Q.  I'm asking about January.
13   A.  Oh, January.  Yes.
14   Q.  You lived in Building 17?
15   A.  Yes.
16   Q.  Do you recall the tier?  If I tell you it was B
17   tier, would that be correct?
18   A.  I think so.  Yeah, you might be correct.  It's
19   been a while back.
20   Q.  It has been some years.
21        Now, particularly on that time in January
22   that I'm referring to, January 17th of 2004, there was
23   feces and urine on your front of your cell outside your
24   cell.  Is that correct?

Page 7

1    A.  No, ma'am.
2    Q.  There was a tier check on your tier and your
3    cell --
4    A.  Tier check?  Do you mean by officer routine?
5    Q.  Correct.
6    A.  Yes.
7    Q.  Do you remember an incident in January 17 of
8    2004?
9    A.  Yes.  I understand now.  B tier, yes.
10   Q.  Okay.  You put feces and urine outside your cell?
11   A.  No.  I don't remember that.
12   Q.  I'm going to show you, if I may, a document.
13   A.  Yes.
14   Q.  I ask that you take a look at that document.
15   A.  Do you have --
16   Q.  Just take a look at that document and then I will
17   ask you some questions regarding that.
18        This is an incident report, incident number
19   1008299.  This incident date is January 17th, 2004.  The
20   location of this incident is Building 17, B tier.  The
21   incident report indicates the conditions violated were
22   created a health safety and fire hazard and lying.  Do
23   you see that, sir?
24   A.  Yes, ma'am.

Page 8

1    Q.  Now, the description of the incident, do you see
2    that, sir?
3    A.  Yes, ma'am.
4    Q.  Okay.  It describes that during the tier check
5    there was feces and urine laying on the floor outside
6    BL 1 cell?
7    A.  Yes.
8    Q.  That was your cell, sir?
9    A.  Yes, ma'am.
10   Q.  It appeared as if it was thrown from your cell by
11   you, S1, Tyrone Guinn?
12   A.  Yes.  I see that in the writing.
13   Q.  You were asked why you threw it out of your cell.
14   The statement, it reports you stated, "I did not do it, I
15   had nothing to do with it."
16   A.  Yes, ma'am.
17   Q.  Then the reporter asked subject 2, which is
18   another inmate, if he threw the feces and urine.  And he
19   replied, no, stated that you, S1, threw it out of your
20   cell.  Do you see that?
21   A.  Yes, ma'am.
22   Q.  At that point you cleaned up -- you volunteered
23   to clean up the feces and the urine off of the floor?
24   A.  Yes, ma'am.

Page 9

1    Q.  You did that?  Did you clean up the feces and
2    urine off the floor?
3    A.  Yes, ma'am.
4    Q.  Okay.
5        MS. WATERS:  May I have this marked?
6        (Defendants' Deposition Exhibit No. 1 marked
7    for identification.)
8    BY MS. WATERS:
9    Q.  Now, you were charged with offenses and
10   disciplined for this incident.  Is that correct?
11   A.  Like during, within the institution?
12   Q.  Yes.
13   A.  Yes.
14   Q.  Okay.  Do you recall what sanction you received
15   as a result of this incident?
16   A.  No, ma'am.
17   Q.  But you were sanctioned?
18   A.  Yes.
19   Q.  Internally?
20   A.  I filed an appeal also to this current action,
21   disciplinary action.
22   Q.  On February 14, 2004 -- this has been after this
23   incident -- you were charged with assaulting an inmate
24   while you were in the chow hall, Building 24?

3 (Pages 6 to 9)

Page 10

1    A.  Yes.
2    Q.  At that time you were charged with walking up
3  behind an inmate, Inmate Jones. You slammed a tray on
4  his back, of food, while he was eating. Do you recall
5  that?
6    A.  Yes, I do.
7    Q.  You began punching him?
8    A.  Yes, ma'am.
9    Q.  Officers had to radio for backup?
10    A.  Yes, ma'am.
11    Q.  Do you recall that?
12    A.  Yes, ma'am.
13    Q.  Let me ask you: That assault on Inmate Jones,
14  was that gang related?
15    A.  No, ma'am.
16    Q.  Are you a member of any gang?
17    A.  Yes, ma'am.
18    Q.  But that incident was not gang related?
19    A.  No, ma'am.
20    Q.  What is the gang that you are affiliated with?
21    A.  Rolling 60 Crip.
22    Q.  On March 12, following this, you damaged some
23  cabinet doors, some property by writing gang insignia,
24  pictures and words?

Page 11

1    A.  No, ma'am. I don't recall that.
2    Q.  One moment, if you bear with me.
3         I'm going to show you this incident
4  report --
5    A.  At this time, I'd like to object at this time.
6    Q.  I'm going to -- I'm sorry. This is the document
7  I want you to review. I've just shown you an incident
8  report. This incident report is dated March 12, 2004,
9  incident number 1010086. Do you see this incident
10  report?
11    A.  Ma'am, I'd like to object to this question.
12    Q.  I haven't asked a question yet, except do you see
13  the report?
14    A.  Yes. I do see the report.
15    Q.  This incident report, the incident location,
16  Building 18, C tier, upper 10. Do you see that, sir?
17    A.  Yes, ma'am.
18    Q.  Violation conditions are damage or destruction
19  under $10, failing to obey an order and possession of
20  nondangerous contraband. Do you see that, sir?
21    A.  Yes.
22    Q.  And the description of the incident, do you see
23  that section?
24    A.  Yes. I see that, ma'am.

Page 12

1    Q.  Okay. The description states: "At the above
2  date and time Sergeant Rutkowski and Officer Lloyd
3  conducted a shake down of Tyrone Guinn's cell." That is
4  you, sir. Do you agree?
5    A.  Yes, ma'am.
6    Q.  And the reporter states: "I did observe that
7  inmate had written with pen on his cabinet doors gang-
8  related pictures and words. Inmate had also scratched
9  onto his door more gang-related things." Do you see
10  that, sir?
11    A.  Yes. I see it to the right.
12    Q.  Officer Lloyd then found 4 pages in his cell,
13  Inmate Guinn's cell, that contained Crip writing.
14    A.  Yes. I see that according to the write-up.
15    Q.  Did you have this writing on your cell -- as it
16  is described here in this description?
17    A.  No, ma'am. As I object -- I don't know if you
18  understand objection or not, but I do object to this
19  question.
20    Q.  Does that mean you are not going to answer the
21  question?
22    A.  Yes, ma'am.
23    Q.  I don't understand what your question is. I'd
24  like to admit this as Exhibit Number 2.

Page 13

1         You recall this incident that is described
2  in this incident report?
3    A.  Yes. As produced in the write-up, yes. I do see
4  the write-up.
5    Q.  You were interviewed by IA, Internal Affairs,
6  regarding the writing that was on the property?
7    A.  Yes, ma'am.
8    Q.  You were in this cell, this is your cell that is
9  described in this report?
10    A.  Yes, ma'am.
11    Q.  Is this a single cell, sir?
12    A.  Yes.
13         (Defendants' Deposition Exhibit No. 2 marked
14  for identification.)
15         THE WITNESS: It's also a facility where
16  pretrial and disciplinary action also goes into the cell,
17  too, also.
18  BY MS. WATERS:
19    Q.  On that same evening, however, after this
20  scrawling and words and pictures were found in your cell,
21  you were going to be transferred with other inmates to
22  another location. Do you recall that?
23    A.  Yes, ma'am.
24    Q.  At the time you refused to be transferred because

4 (Pages 10 to 13)

Guinn
Tyrone Guinn

v.
C.A. # 06-0075 KAJ

Rispoli, et al.
November 17, 2006

Page 14

1  you indicated that there were Bloods in Building 19, that
2  you did not want to be there?
3     A. Yes, ma'am.
4     Q. What are the Bloods? Is that a gang, also?
5     A. It's a rival gang.
6     Q. Crip rival?
7     A. Yes.
8     Q. Okay. You indicated that you did not want to be
9  transferred to Building 19 because of the rival gang?
10    A. Yes, ma'am.
11    Q. At that time would you agree it was a Quick
12 Response Team that had to assemble in order to have you
13 transferred?
14    A. Yes.
15    Q. At that point, once they assembled you agreed to
16 be escorted to Building 19?
17    A. Yes, ma'am.
18    Q. You had at that cell, when they searched your
19 cell they found information of other inmates, SBI
20 numbers, names of other inmates. Do you recall that?
21    A. No, I don't.
22    Q. Did you have SBI numbers and information
23 regarding other inmates?
24    A. No, I don't.

Page 15

1     Q. I said did you?
2     A. No.
3     Q. You did not.
4        In May of that same year you had a white
5  t-shirt, it was an altered shirt?
6     A. Yes.
7     Q. You had it tied around your head?
8     A. Yes.
9     Q. You were ordered at that time by officers to
10 remove that t-shirt from your head?
11    A. Yes, ma'am.
12    Q. Because that's not permissible attire. You would
13 agree?
14    A. Yes, ma'am.
15    Q. You removed the t-shirt and flushed it down the
16 toilet?
17    A. Yes, ma'am.
18    Q. Because of that you received a write-up --
19    A. Yes.
20    Q. -- for your conduct there?
21    A. Yes.
22    Q. Now, that was in May. Now I'm going to take you
23 to June.
24    A. Yes, ma'am.

Page 16

1     Q. In June, same year, Officer Stevens and Officer
2  Shannon, they were conducting recreational on D tier?
3     A. Yes, ma'am.
4     Q. Okay. At that time you were on yard 2?
5     A. Yes, ma'am.
6     Q. Okay. Those same officers were escorting another
7  inmate, Inmate Hill -- off the record.
8        (Discussion off the record.)
9  BY MS. WATERS:
10    Q. As I said, the officers, Officers Shannon and
11 Stevens were escorting Inmate Hill to recreation. You
12 said yes?
13    A. Yes, ma'am.
14    Q. Now, at the time that you were on the yard, yard
15 2, what did you have on? Were you dressed like you are
16 today? You have on a jump suit?
17    A. Yes.
18    Q. And you have a sweatshirt underneath of that?
19    A. Yes, ma'am.
20    Q. It looks like you have several t-shirts under
21 that?
22    A. No. On that current day I had a sweatshirt and a
23 jumper, t-shirt, boxers, and socks on.
24    Q. And when the officers were walking past the yard

Page 17

1  where you were, that is when you pulled out a container
2  and threw the liquid on the officers and the inmate?
3     A. I don't recall.
4     Q. You don't recall?
5     A. No, ma'am.
6     Q. Do you recall pulling out a container in June --
7     A. No, ma'am.
8     Q. -- of 2004 while you were in the yard?
9     A. No, ma'am.
10    Q. Okay. Do you recall throwing your feces and
11 urine on the officers and the inmate --
12    A. No, ma'am.
13    Q. -- on that day?
14       You don't recall doing it or --
15    A. No, ma'am.
16    Q. So you are saying you don't recall throwing feces
17 and urine and hitting Officer Shannon or Officer Stevens?
18    A. No, ma'am.
19    Q. You don't recall hitting Officer Shannon in the
20 head?
21    A. No, ma'am.
22    Q. Do you recall having feces and urine in a
23 container --
24    A. No, ma'am.

5 (Pages 14 to 17)

Page 18

1    Q. -- on your person?
2    A. No, ma'am.
3    Q. You don't recall that?
4    A. I don't.
5    Q. You don't recall that or you never did it?
6    A. I don't recall it and I never did it at all.
7    Q. Do you recall being disciplined or actually taken
8    to pre hearing detention in June of 2004?
9    A. Yes, ma'am.
10   Q. Do you recall why you were taken to pre hearing
11   detention in June of 2004?
12   A. Yes, ma'am.
13   Q. Wasn't it because of your throwing feces and
14   urine on the officers? And the inmate? In 2004?
15   A. No. It was because Officer Shannon and Stevens,
16   they assumed me as being the assailant, that person. So
17   they escorted me to Building 18, because I was the only
18   person out in the rec yard, besides the food flaps that
19   was alongside the wall. You know what I mean? They
20   assumed me, because I was in the rec yard and they
21   escorted me to Building 18 isolation.
22   Q. You were the only one in the rec yard at that
23   time?
24   A. Yes.

Page 19

1    Q. Okay. That's the yard they were passing with the
2    inmate at that time?
3    A. Yes.
4    Q. You never told the officers that you were not
5    trying to hit them, that you were trying to only hit
6    Inmate Hill?
7    A. No. I don't recall that, ma'am.
8           May I object to this question? This
9    question is still proceeding in court in criminal action
10   also, so I'd like to object, because it is still
11   proceeding through the courts.
12   Q. I'm taking your deposition. You have filed a
13   lawsuit. You have claimed incidents that occurred in
14   June of 2004 as a result of your pre hearing detention,
15   and that's what this is about. And this incident that
16   I'm referring to is the incident that caused you to be
17   placed in pre hearing detention when you threw urine and
18   feces on officers and an inmate as they were walking past
19   you in the yard. That is what this is about.
20          I'm going to show you, sir, three pages,
21   incident number 1013325, which refers to incident date
22   June 30, 2004. Incident location is Building 19, D tier.
23   The violation referred to on this report are an assault,
24   disorderly and threatening behavior, possession of

Page 20

1    dangerous contraband, creating a health, safety and fire
2    hazard.
3           Do you see that document, sir? Three pages?
4    A. Yes, ma'am. I see it.
5    Q. This incident report relates to the -- and it
6    gives a description, if you see the description of the
7    incident of June 30, 2004, this is the incident that you
8    are saying you don't recall. Would you take a moment to
9    look at that description?
10   A. Yes, ma'am. I do see the incident report.
11   Q. The container, the contents in that container of
12   liquid that was thrown and actually hit the officers,
13   that was feces and urine, correct?
14   A. I don't know, ma'am. At the time I don't know.
15   Like I said, I was the inmate in the rec yard. Besides
16   me there was, food flaps were opened up alongside the
17   wall, food flaps were open. Anybody can throw feces on
18   the tier, ma'am.
19   Q. The report indicates that once you were subdued
20   and carried to -- escorted to the interview room, you
21   stated that you were trying to hit an inmate and you were
22   not trying to hit the officers. You never said that?
23   A. No, ma'am.
24   Q. You were seen by a nurse during that time --

Page 21

1    A. Yes, ma'am.
2    Q. -- after you were searched --
3    A. Yes, ma'am.
4    Q. -- to make sure you didn't have contraband and
5    then you were taken to Building 18. Is that correct?
6    A. Yes, ma'am. This all happened within Building
7    18, the isolation. She came down to the isolation room
8    where I was at.
9    Q. That's where you were escorted to isolation from
10   Building 19?
11   A. Yes.
12   Q. Because this happened while you were on rec?
13   A. Yes, ma'am.
14   Q. And then you were escorted to 19?
15   A. 18.
16   Q. I apologize. After you saw a nurse?
17   A. Yeah.
18   Q. Now, when you were, after you saw the nurse were
19   you provided -- what clothing were you provided?
20   A. The nurse came down to building 18 to see me,
21   which I was already in isolation. So when she came down
22   to see me, I was in my boxers, undershorts, just those.
23   Q. When -- I'm going to take you back for a moment
24   when you were first escorted from 19, after this incident

6 (Pages 18 to 21)

Guinn
Tyrone Guinn

v.

C.A. # 06-0075 KAJ

Rispoli, et al.
November 17, 2006

Page 22

1  where the feces and urine were thrown on officers and the
2  inmate, did you attempt to resist Officer Stevens as they
3  were trying to handcuff you?
4      A.  No, ma'am.
5      Q.  You didn't offer any resistance at all?
6      A.  No, ma'am.
7      Q.  Did you have an opportunity -- after the incident
8  and you were escorted to Building 18, did you have an
9  opportunity to talk to Captain McCreanor?
10     A.  Yes, ma'am.
11     Q.  You also talked to Lieutenant Rispoli at that
12  time?
13     A.  Yes, ma'am.  He was present.
14     Q.  Was Sergeant Phillips also present?
15     A.  Yes, ma'am.
16     Q.  Okay.  Now, these are officers that responded to
17  the call after the incident where the feces and urine was
18  thrown on Officer Shannon, correct?
19     A.  Yes, ma'am.  Officer Phillips, he was a sergeant
20  working at the institution that day.  He was the one that
21  conducted the shake down and strip search and prodded me
22  without clothing.
23     Q.  When you were -- we will get to that in a moment
24  for more clarity.  You are saying when you were taken to

Page 23

1  Building 18 you were in pre hearing detention?
2      A.  Yes, ma'am.
3      Q.  A nurse came down and examined you to make sure
4  you were okay, medically sound after they had escorted
5  you from 19?
6      A.  Yes, ma'am.
7      Q.  It was determined then that you had no bumps or
8  bruises, you were okay?
9      A.  Yes, ma'am.
10     Q.  When you spoke -- let me ask you:  Did you speak
11  to Captain McCreanor?
12     A.  Yes, ma'am.  I did.
13     Q.  Did you tell him that you weren't trying to hit
14  the inmate -- you weren't trying to hit the COs, you were
15  trying to hit the inmate?
16     A.  I don't recall that at all.
17     Q.  Do you recall what conversation you had with
18  McCreanor?
19     A.  I did not have no conversation with him at all.
20     Q.  I thought you just indicated that you talked to
21  Captain McCreanor?
22     A.  This happened during Building 18 isolation.  What
23  you are talking about is on the way to isolation.  It
24  says in the write-up it's on the way to the isolation, I

Page 24

1  had explained -- I talked to the sergeant that I wasn't
2  trying to hit the inmate, that was on the way to
3  isolation.
4      Q.  You said that to Sergeant Phillips?  You said
5  "sergeant."  What sergeant are you talking about?
6      A.  Sergeant, Captain on the way to sending me to
7  isolation.  That's what they put in the report, that I
8  said I wasn't trying to hit the inmate, which I did not
9  say at all.
10         On the way to isolation, on the way down in
11  isolation, only thing I said to Captain McCreanor was may
12  I receive some clothing?  That was the only words I said
13  to him.
14         MS. WATERS:  I'd like to mark this item of
15  three pages as Defendants' 3.
16         (Defendants' Deposition Exhibit No. 3 marked
17  for identification.)
18  BY MS. WATERS:
19     Q.  When did you remove your jump suit?  At what
20  point had you removed your jump suit?  Where were you?
21     A.  I hadn't removed my jump suit at all.
22     Q.  So you still had it on when you were in Building
23  18?
24     A.  Yes.  I had my jump suit on when I got to

Page 25

1  Building 18.  Sergeant Phillips conducted a shake down,
2  when I was in 18 he told me to take off my jumper, which
3  should be in his incident report.  He told me to take off
4  my jumper.  So when I took off my jumper, he told me to
5  strip search, you know, the routine of the strip search,
6  gave me my boxer undershorts back.  That was all.
7      Q.  Okay.
8      A.  Captain McCreanor and Rispoli, they was present
9  at the time.  It should be in their incident report,
10  ma'am.
11     Q.  Do you have a history since being incarcerated of
12  throwing urine and feces?
13     A.  No, ma'am.
14     Q.  I want to take you back to when you were at
15  Gander Hill.  There was a point of time when you were at
16  Gander Hill Prison, Multi Purpose Criminal Justice
17  Facility.  Do you recall that in 2003?
18     A.  No, ma'am.  I was down here in 2003, ma'am.  I
19  came down here November 12, 2002, as I indicated.
20     Q.  So you have been here at DCC since 2002?
21     A.  Yes, ma'am.
22     Q.  In 2003, the multidisciplinary team -- you are
23  familiar with the classification system?
24     A.  Yes.

7 (Pages 22 to 25)

Guinn                                                                          Rispoli, et al.
Tyrone Guinn                          C.A. # 06-0075 KAJ                        November 17, 2006

Page 26

1  Q. You are classified regularly. You were
2  classified in March of 2003?
3  **A. Not that I know of, ma'am. You got to be more**
4  **specific. I don't understand.**
5  Q. I'm going to show you a copy of your
6  classification form, dated March 18 of 2003. Do you see
7  that?
8  **A. Yes, ma'am.**
9  Q. On this classification, this is a report that
10 shows where you would be housed. They use this to
11 determine where you would be housed in the facility and
12 the kinds of programs you will be involved in in the
13 facility. Is that correct?
14 **A. Yes, ma'am.**
15 Q. The document that I handed you is two pages?
16 **A. Yes, ma'am.**
17 Q. If you turn to the second page of this
18 classification report that I've provided to you, the
19 report indicates that the multidisciplinary team issued
20 an override of your security level, because at that time
21 it was recommended that you may qualify for medium
22 security. However, they had a concern and they overrode
23 that decision, that recommendation. And do you see, sir,
24 where it is checked "reason for override"? It says you

Page 27

1  have a serious pattern of negative behavior, you received
2  several write-ups for throwing urine and feces at Multi
3  Purpose Criminal Justice Facility, your continued
4  negative behavior here. Do you see that?
5  **A. Yes, I see it according to the classification.**
6  Q. Okay. And then under comment section it says,
7  "Inmate Guinn appears appropriate for medium, but Inmate
8  Guinn has a serious pattern of negative behavior." Do
9  you see that?
10 **A. Yes, I see it according to classification.**
11 Q. That was your classification in March '03.
12        MS. WATERS: May I have this marked, please.
13        (Defendants' Deposition Exhibit No. 4 marked
14 for identification.)
15        THE WITNESS: I wanted to know if that
16 classification was here? It don't have on the top where
17 it was at.
18 BY MS. WATERS:
19 Q. You said you were here in 2002 -- 2003?
20 **A. Yes, ma'am.**
21 Q. That is March 18, '03?
22 **A. That was here.**
23 Q. That's when the classification was done.
24        I'm going to also show you, sir, another

Page 28

1  classification document. This is a classification
2  following the March 18, '03 classification.
3  **A. '04 you mean?**
4  Q. This is '04. This was a classification as a
5  result of the incident that you -- June 30, '04 incident
6  where they described your predatory behavior.
7  **A. Yes, ma'am.**
8  Q. Now, again, on this classification you were
9  recommended for SHU security housing unit?
10 **A. Yes, ma'am.**
11 Q. Once again, some of the reasons were your
12 assaults that you had conducted in the detention
13 facility. On June 30, '04 you were charged with assault,
14 you were ultimately convicted of that, is that correct,
15 assault in detention facility?
16 **A. One count, yes, ma'am.**
17 Q. Actually, you were prosecuted, you were
18 criminally prosecuted for that outside of the
19 institution. Is that correct?
20 **A. One count, yes, ma'am.**
21 Q. Okay. That was for throwing urine and feces and
22 hitting an officer, assaulting an officer. Is that
23 correct?
24 **A. One count, yes, ma'am.**

Page 29

1  Q. That's the June 30, '04 incident?
2  **A. Yes.**
3  Q. Okay. It was your history, your conduct, your
4  institutional conduct and your behavior that warranted
5  you remaining in the security housing unit through this
6  time period. Is that correct?
7  **A. My history --**
8  Q. Violent history, your history of assaults, your
9  history of breaking the rules?
10 **A. According to the classification, yes, ma'am.**
11 Q. Now I'm going to change gears for a moment,
12 because on July 2nd of 2004 you filed a grievance,
13 correct? You were complaining that you were placed on
14 strip cell status?
15 **A. Yes, ma'am.**
16 Q. Do you recall that?
17 **A. No. I don't recall that, ma'am.**
18 Q. One moment, please.
19        Sir, I just presented you a copy of a form
20 number 584, grievance form. Does that look familiar to
21 you, sir?
22 **A. Yes, ma'am.**
23 Q. It is a handwritten form. It says, facility,
24 DCC; grievant's name, Tyrone Guinn. It has your SBI

8 (Pages 26 to 29)

Guinn                                    v.                              Rispoli, et al.
Tyrone Guinn                      C.A. # 06-0075 KAJ                November 17, 2006

Page 30

1   number 375731?
2       A. Yes, ma'am.
3       Q. And it says under the line where it says case
4   number, "inmate not received state items"?
5       A. Yes, ma'am.
6       Q. Okay. Now, in your description of this grievance
7   form, you state "on February 24" -- is that right?
8       A. 27.
9       Q. "On February 27th I put in an item request form
10  for clothes"?
11      A. Yes.
12      Q. Can you read that, sir?
13      A. "On February 27th, '04 I put in an item request
14  form for clothing and since I haven't received any of the
15  items yet and it's been over 8 months, then I sent
16  another letter on April 12th, '04. Still haven't gotten
17  any of the needed items. I ordered three t-shirts, three
18  underwears, three socks, a towel, wash cloth and white
19  shoes size 10."
20      Q. The date of this grievance form -- what's the
21  date on this grievance form?
22      A. July 28th. July 28th, '04.
23      Q. The action requested by the grievance, do you see
24  that section?

Page 31

1       A. Yes.
2       Q. Can you read that, please?
3       A. "I respectfully ask by grievance action request
4   to have investigation done on the clothing request
5   officer to see what's going on with inmate receiving his
6   clothes, because it's been over 7 months and I don't have
7   any of these items above."
8       Q. It says, "grievant's signature." Is that your
9   signature, sir?
10      A. Yes.
11      Q. Tyrone Guinn?
12      A. Yes.
13      Q. It is dated?
14      A. July 28th, '04.
15      Q. Do you see the document is stamped on the bottom,
16  it says, "Received August 2nd, 2004, Inmate Grievance
17  Office"?
18      A. Yes.
19          MS. WATERS: May I have this marked, please.
20          (Defendants' Deposition Exhibit No. 5 marked
21  for identification.)
22  BY MS. WATERS:
23      Q. That document I just showed you, that is a
24  grievance that you filed in June -- July of '04?

Page 32

1       A. Yes.
2       Q. Mr. Guinn, I'm going to show you another form,
3   number 584. This form is dated July 2nd, 2004?
4       A. Yes.
5       Q. And this is a grievance form?
6       A. Yes.
7       Q. This housing unit states "C SHU 18." Is that
8   correct?
9       A. Yes. That's where I was isolated at.
10      Q. Sir, you see the brief description, "Reason for
11  the grievance"? Can you read that, please?
12      A. That I be given --
13      Q. Excuse me. Start from the reason it states.
14      A. Oh, the statement. "I was placed in isolation
15  under strip cell conditions when I was not a threat to
16  myself or being classified or recommended by mental
17  health" --
18      Q. Is that personnel?
19      A. Yes, "personnel after being seen" --
20      Q. It looks like determined.
21      A. -- "determined to be a threat to myself or my
22  life. I never said I was going to harm myself and if I
23  did mental health would have to see me and determine if I
24  should be kept under suicidal status and stripped of my

Page 33

1   clothing. The conditions that I was placed in is against
2   the law and a lawsuit can be filed" --
3       Q. Does that say can or was?
4       A. No. It say can. It say can. "Lawsuit can be
5   filed on this exact position and was considered cruel and
6   unusual punishment."
7       Q. "The condition that I was placed in is against
8   the law as a lawsuit was filed on this exact practice and
9   was considered cruel and unusual punishment." Is that a
10  correct reading of what you wrote?
11      A. It's in cursive -- I guess you can call it that.
12  It's in fast cursive.
13      Q. Did you write this, sir?
14      A. Yes, ma'am.
15      Q. You say you wrote this grievance while you were
16  in isolation?
17      A. Yes, ma'am.
18      Q. Pre hearing detention. What is the action
19  requested by you, the grievant?
20      A. That I be given the blankets, sheets and clothing
21  that I'm entitled of.
22      Q. Okay. And this is dated July 2nd, 2004?
23      A. Yes, ma'am.
24      Q. Is your signature down there?

9 (Pages 30 to 33)

# EXHIBIT A (cont')

Page 34

1    A.  Yes, ma'am, it is.

2         MS. WATERS: I'd like to have this marked,

3    please.

4         (Defendants' Deposition Exhibit No. 6 marked

5    for identification.)

6    BY MS. WATERS:

7    Q.  Now, this grievance form that we just reviewed, I

8    have provided you with two pages of that. This is a

9    two-sided copy?

10   A.  Yes, ma'am.

11   Q.  The back side of that document, do you see

12   checks?

13   A.  Yes.

14   Q.  What does that indicate?

15   A.  "Non-grievable. This issue has been defined as

16   non-grievable in accordance with DOC policy 4.4. These

17   procedures have their own appeal process that must be

18   followed. Disciplinary action."

19   Q.  That's signed by, initialed by the Inmate

20   Grievance Chairperson at that time?

21   A.  Yes, ma'am.

22   Q.  What's the date on that?

23   A.  July 8th, 2004.

24   Q.  So I'm going to take you back to the front side

Page 35

1    of this document. In your action requested, what

2    officers do you name in this grievance form? Do you name

3    any officers -- I want you to look at this grievance

4    form --

5    A.  No, ma'am.

6    Q.  Okay. What process did you take for the

7    disciplinary action appeal process after filing this

8    grievance form?

9    A.  The 4.4 policy that was provided to me according

10   to the procedures of disciplinary action.

11   Q.  What did you do?

12   A.  I filed a complaint, a letter explaining that I

13   was being held in cruel unusual punishment by me not

14   having no clothing, simple.

15   Q.  You said you filed a complaint. What exactly,

16   what steps did you take? That's what I'm trying to

17   understand, because I know you filed this grievance form.

18   A.  Yes, ma'am.

19   Q.  But then they told you that you have to file an

20   appeal through the disciplinary process. What did you do

21   next?

22   A.  After I sent my complaint letter to the procedure

23   office, disciplinary action, I hadn't received no

24   response letter back to file an appeal.

Page 36

1    Q.  You sent a letter to whom?

2    A.  Disciplinary action, their office. They say to

3    follow procedure send to disciplinary office. So I

4    sent -- I wrote a letter, you know what I mean,

5    explaining what my case was.

6    Q.  Who did you send that letter to?

7    A.  Disciplinary action office within the

8    institution.

9    Q.  You don't recall --

10   A.  It just say send disciplinary action to the

11   appeals process. So what I did, I filed a

12   disciplinary -- I wrote the letter out, put it in an

13   envelope. I put on the front of the envelope,

14   disciplinary action/in-house mail.

15   Q.  Who did you give that letter to?

16   A.  Current CO that was working that night. I have

17   no names. It's been a while.

18   Q.  Let me ask you: Did you fill out a form?

19   A.  What kind of form?

20   Q.  Did you fill out a form, just as you did this

21   grievance form when you wanted to appeal the -- as part

22   of the disciplinary process?

23   A.  No. What I did, I simply wrote down on a piece

24   of paper to the office explaining what occurred, you know

Page 37

1    what I mean? And I haven't got no response back.

2    Q.  You didn't get a response back you say, but the

3    other grievance that, the first grievance that we made

4    reference to, July 28th, you didn't mention in there that

5    you filed an appeal process, did you?

6    A.  May I see that paper, ma'am?

7    Q.  This is the July 28th, '04.

8    A.  This was returned back to me as non-grievable. I

9    think it should say it at the back of this, back of the

10   reverse form, form 584.

11   Q.  My question is: Did you mention in that letter,

12   that grievance form, that you had not heard the appeal

13   process for the disciplinary action?

14   A.  No, ma'am.

15   Q.  Also, in this grievance form, the July 28th, '04

16   grievance form, as well as the July 2nd grievance form,

17   you have not put names of officers regarding the

18   grievances, correct?

19   A.  Names of officers?

20   Q.  Correct.

21   A.  It didn't need no names of officers, ma'am.

22   Q.  More specifically, you are suing now Officer

23   Rispoli, Captain Rispoli. Why are you suing him?

24   A.  I'm suing Rispoli because on 6-30-04, him,

10 (Pages 34 to 37)

Guinn
Tyrone Guinn

v.

C.A. # 06-0075 KAJ

Rispoli, et al.
November 17, 2006

Page 38

1  Captain McCreanor, David Phillips, placed me in
2  isolation, strip cell confinement conditions, which I
3  wasn't supposed to be in. They intentionally
4  deliberately just gave me my boxers, without sheets or
5  blankets for 14 days, depriving me of human basic needs.
6      Q. Let me ask you, during that time -- you talk
7  about strip cell conditions. Describe the cell that you
8  were in.
9      A. A cell is simply a toilet and a bed.
10     Q. Okay. You had a toilet, you had a bed?
11     A. That's all, ma'am.
12     Q. It is your testimony today that you did not have
13  any covering?
14     A. I had no sheets, no blankets, no pillow.
15     Q. What did you have to cover your body?
16     A. Nothing, ma'am. Only my boxers that I was given
17  after shake down, strip search.
18     Q. You say you are suing Rispoli and his -- in his
19  capacity as what?
20     A. Depriving me of human basic needs, clothing.
21     Q. What did Rispoli do?
22     A. He deprived me -- he was the captain working that
23  night -- better yet, he was the lieutenant working that
24  night. Lieutenant is in charge of anything that's going

Page 39

1  on in the area. So he was present when Lieutenant
2  Phillips and Captain McCreanor told me to strip search.
3  He was supposed to provide me with sheets, blankets and
4  clothing. I was down there 14 days with no clothing. I
5  even sent him letters.
6      Q. You are suing Phillips?
7      A. Yes, ma'am.
8      Q. Why are you suing him?
9      A. He was the sergeant that was working the Building
10  19, 1 B tier -- he was the sergeant working 19 B tier at
11  the time the assault occurred on Shannon and Stevens. He
12  escorted me to isolation.
13     Q. Okay. He escorted you to isolation and then what
14  happened?
15     A. Then he told me to strip search, take my clothing
16  off, lay on the bump, put my hands behind my head, shut
17  the door. Just give me boxers back.
18     Q. Then he left?
19     A. Yes, ma'am.
20     Q. That's all he did?
21     A. He never gave me my sheets, blankets or clothing.
22     Q. Okay. Now, at that point you indicated, I think
23  you testified before it was routine that they strip --
24  that was a routine search, strip search?

Page 40

1      A. Yes, ma'am.
2      Q. Do they always search an inmate when they are
3  going into pre hearing detention?
4      A. They strip search them and they give their
5  clothes back to them and they gave their sheets and
6  blankets to them.
7      Q. That's routine?
8      A. Yes, ma'am.
9      Q. You are suing Merson?
10     A. Yes.
11     Q. Why?
12     A. She's the grievance chair officer that accepts
13  the grievance forms. When I sent this form to her on
14  6-30 -- 7-2-04, she returned my grievance back to me
15  saying non-grievable, which I can't have clothing, almost
16  nearly a month after I completed my 14 days of being
17  deprived of clothing.
18     Q. So the reason -- that's your reason for suing
19  Merson?
20     A. Yes, ma'am.
21     Q. You agree that she did respond to you and tell
22  you that it was an action that had a different process,
23  an appeal process?
24     A. Yeah, non-grievable.

Page 41

1      Q. She did tell you that there was another process
2  that you had to follow for the issues that --
3      A. Yes, ma'am.
4      Q. Okay. You are also suing Warden Carroll?
5      A. Yes, ma'am.
6      Q. Why are you suing Warden Carroll? What did he do
7  to you?
8      A. Warden Carroll, he's the warden of the
9  institution. Anything that goes on in the institution,
10  you know what I mean, is under his control. I'm suing
11  him because he provided his officers without ordinary
12  training and skill within the DOC policies, so I sue him
13  for being held liable for his action.
14     Q. So because he supervises these officers?
15     A. Without giving proper training, ordinary training
16  to those officers, without giving proper ordinary
17  training.
18     Q. What are you referring to?
19     A. Like any time you are employed here, you supposed
20  to be -- you are supposed to go through a process. You
21  are supposed to have training, ordinary skill within DOC,
22  which means anything that goes on in DOC, you know what I
23  mean, is supposed to be trained by him. He supposed to
24  give you the training.

11 (Pages 38 to 41)

Guinn
Tyrone Guinn

v.

C.A. # 06-0075 KAJ

Rispoli, et al.
November 17, 2006

Page 42

1    So I'm suing him because he gave them no
2  ordinary training, whatsoever. If he would have gave
3  them ordinary training, proper skill, none of this would
4  have occurred.
5    Q. You were carried to pre hearing detention because
6  of your conduct. You would agree you are the one that
7  threw the feces?
8    A. No, ma'am.
9    Q. No, ma'am what?
10   A. You just said I was the one that threw the feces.
11  I said, no, ma'am.
12   Q. You are saying you didn't throw the feces or
13  urine?
14   A. Yes, ma'am. I did not throw them.
15   Q. But you were convicted of throwing the feces and
16  urine?
17   A. Yes, ma'am.
18   Q. You are suing McCreanor. Why are you suing
19  McCreanor?
20   A. McCreanor is the captain. He's the captain
21  within the SHU, which -- that night he was the captain.
22  Anything that goes on within the institution back here in
23  the SHU he's responsible for.
24     Also, he was present when David Phillips and

Page 43

1  Lieutenant, what's his name, Rispoli, whatever his name
2  is, deprived me of my sheets and my blankets and did not
3  come back, give me my sheets and blankets to me, or my
4  clothing.
5    Q. This is on June 30th?
6    A. Yes, ma'am.
7    Q. You are saying what McCreanor did to you was on
8  June 30?
9    A. Yes, ma'am. I also sent him letters, too.
10   Q. You are suing Officer Gonzalez ?
11   A. Yes, ma'am.
12   Q. What did Officer Gonzalez do to you?
13   A. Gonzalez was the officer working isolation that
14  night, 4:00 to 10:00 shift through June 30, 2004, until
15  July -- my fault, excuse me, June 14, 2004, throughout
16  basically my stay in isolation being deprived of sheets
17  and blankets. He didn't provide me with sheets and
18  blankets.
19   Q. Was it one officer working at night?
20   A. No, ma'am. It was two officers.
21   Q. What contact did you have with Officer Gonzalez?
22  What exactly did he actually do to you?
23   A. Gonzalez, as I repeat, he was CO, the officer
24  that was working that night, June 30, all the way to June

Page 44

1  14, throughout my incarceration when I was being deprived
2  of sheets and blankets. His job was to provide me with
3  sheets and blankets and my clothing.
4    Q. Now let me ask you, Mr. Guinn, how normally do
5  you get your clothing? What's the process that you go
6  through to get your clothing?
7    A. You have to be more specific.
8    Q. You got your jump suit on today. How do you get
9  your clothing?
10   A. I'm saying we are given clothing when we come
11  back into isolation, back into the SHU. SHU and
12  isolation is two different things, ma'am.
13   Q. What I'm asking you is, I'm trying to
14  understand -- you get your clothing. I need to know what
15  process is available, how do you get your clothing on a
16  regular basis?
17   A. When we come back into the SHU, they
18  automatically give it to us. They automatically give it
19  to us if we ask CO or sergeant -- we got to ask the
20  lieutenant working the shift during the night to get our
21  clothing. We ask him, we need more clothing, we need new
22  clothing. Might have holes or whatever.
23   Q. What is the process?
24   A. Just write a letter. Simple as that.

Page 45

1    Q. To whom?
2    A. To lieutenant that is working 4:00 to 12:00 shift
3  in Building 20.
4    Q. Then what happens after you write a letter? Do
5  you get your clothes the same day?
6    A. No, ma'am.
7    Q. What happens?
8    A. It might take months before you even get your
9  clothing back or might not get it at all, ma'am.
10   Q. Okay. The items that you get, are they specific
11  in numbers? Or can you just get a load of stuff,
12  whatever you want?
13   A. No. Procedure back here in SHU, you get four
14  t-shirts, three boxers, two sweatshirts, one -- two
15  jumpers, and a skull cap.
16   Q. How often are those items changed, because I
17  imagine you have to launder them?
18   A. Laundry is every Wednesday -- every Tuesday and
19  Thursday. That's when we do laundry back in the SHU.
20   Q. Do you do your own laundry? Explain that to me,
21  please.
22   A. We put our laundry in a laundry bag, like a
23  laundry bag that every inmate receives when he moves into
24  his cell. So we, if we need to wash our clothes, we put

12 (Pages 42 to 45)

Guinn                                  v.                                  Rispoli, et al.
Tyrone Guinn                    C.A. # 06-0075 KAJ                    November 17, 2006

Page 46

1 our clothes into the laundry bag, which the cell the
2 inmate is in, so when he gets it back --
3    Q.  Someone picks it up from the cell?
4    A.  Yes, ma'am.
5    Q.  Takes it to laundry?
6    A.  Yes.
7    Q.  This is done how often?
8    A.  Tuesday and Thursday.
9    Q.  Every week?
10   A.  Yes, ma'am.
11   Q.  It is taken out Tuesday, returned on Thursday, or
12 something in its place?
13   A.  Yes, ma'am.
14   Q.  Let me ask you, during this time that you were in
15 isolation was your food brought to you?  How do you eat?
16   A.  Yes, ma'am.  We receive meals from the officers.
17 We get lurch, dinner, breakfast.
18   Q.  So you did get, during this time you got your
19 meals, three times a day?
20   A.  Yes, in June 30.
21   Q.  You got your meals?
22   A.  Yes, ma'am.
23   Q.  Did you get an opportunity to see medical staff?
24   A.  Yes, ma'am.

Page 47

1    Q.  How would that take place?
2    A.  Medical staff, she would come around once like
3 early in the morning, like around like 3:00, early in the
4 morning.
5    Q.  3:00 a.m.?
6    A.  Yes, ma'am.
7    Q.  How often would medical come around?
8    A.  She would come around like, every like day.
9    Q.  So every day while you were there you got to see
10 medical?
11   A.  Yes, ma'am.  If you had medication, yes.
12   Q.  Let me ask you briefly, I'm about ready to wrap
13 this up, what are you seeking?  What are trying to
14 accomplish in this lawsuit?
15   A.  What I'm trying to accomplish, punitive damages.
16   Q.  I'm sorry?
17   A.  Punitive damages.
18   Q.  Punitive damages?
19   A.  Yes, ma'am.
20   Q.  What else?
21   A.  That's basically -- damages for me being -- for
22 each day that I was down in confinement being deprived of
23 my clothing.  I was being deprived of my clothing,
24 sheets, blankets.  So basically each day that I was being

Page 48

1 deprived of that, each -- 14 days that I was down there,
2 you know what I mean?
3    Q.  Let me ask you, each day that you were down there
4 and you didn't have a blanket, this was in June, July of
5 2004?
6    A.  Yes.
7    Q.  What did you tell the medical people?
8    A.  On June 30th when I was down there I told them,
9 you know what I mean, that I simply didn't have no sheets
10 or blankets.  When they came around like 3:00 in the
11 morning, I told them I didn't have no blankets and
12 sheets.
13   Q.  Did you tell them anything else?
14   A.  I had no clothing.  Can you get the lieutenant or
15 anybody that can provide me with basic human needs.
16   Q.  Anything else?
17   A.  That's all, ma'am.
18   Q.  You didn't tell them anything else?
19   A.  No, ma'am.
20   Q.  So the time that you were down there, your only
21 complaint was that you didn't have blankets?
22   A.  Sheets, clothing.  And it was cold, freezing cold
23 down there.
24   Q.  You didn't complain to medical about that?

Page 49

1    A.  I complained to medical also that I didn't have
2 no sheets, blankets, clothing, and that it was cold,
3 freezing cold, because I was down there 14 days with no
4 clothing.  Below zero conditions, freezing temperatures.
5    Q.  That was in June and July, correct?
6    A.  Yes.
7    Q.  One other question:  Did you complain to medical,
8 did you -- what was your medical condition when you were
9 down there?
10   A.  I didn't have no medical condition, because I
11 didn't have no medication.  So, therefore, I didn't have
12 to ask for nothing.
13       MS. WATERS:  Okay.  I have no further
14 questions for you, Mr. Guinn.  I appreciate your time.
15 At this point we are going to end this deposition.  You
16 will have an opportunity to -- you will have an
17 opportunity to review the transcript to read it and
18 review it and make appropriate corrections.  For
19 instance, if there's a misspelled word or a typo for
20 something that you stated, you can make a correction.
21 You will get that opportunity.  Then you will sign that?
22       THE WITNESS:  Yes.
23       (The deposition concluded at 10:30 a.m.)
24

13 (Pages 46 to 49)

Guinn                                    v.                        Rispoli, et al.
Tyrone Guinn                        C.A. # 06-0075 KAJ          November 17, 2006

Page 50

1                    I N D E X
2    DEPONENT:  TYRONE GUINN                      PAGE
3        Examination by Ms. Waters            2
4

              E X H I B I T S

5
      DEFENDANTS' DEPOSITION EXHIBITS        MARKED
6
        1                        9
7        2                       13
         3                       24
8        4                       27
         5                       31
9        6                       34
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 52

1    State of Delaware)
                       )
2    New Castle County)
3
4           CERTIFICATE OF REPORTER
5
       I, Vincent J. Bailey, Registered Professional
6    Reporter and Notary Public, do hereby certify that there
     came before me on November 17, 2006, the deponent herein,
7    TYRONE GUINN, who was duly sworn by me and thereafter
     examined by counsel for the respective parties; that the
8    questions asked of said deponent and the answers given
     were taken down by me in Stenotype notes and thereafter
9    transcribed by use of computer-aided transcription and
     computer printer under my direction.
10
       I further certify that the foregoing is a true
11   and correct transcript of the testimony given at said
     examination of said witness.
12
       I further certify that I am not counsel,
13   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
14
15
16
            Vincent J. Bailey, RPR,
17          Certification No. 171-RPR
            (Expires January 31, 2008)
18
19   DATED:  12-4-06
20
21
22
23
24

Page 51

1
2
3          REPLACE THIS PAGE
4          WITH THE ERRATA SHEET
5          AFTER IT HAS BEEN
6          COMPLETED AND SIGNED
7          BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

14 (Pages 50 to 52)

# EXHIBIT 1

**Incident#**
**1008299**

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone#: 302-653-9261

Date: 05/10/2006

## INCIDENT REPORT

| Group #:N/A | Type: Inmate Involved | Incident Date: 01/17/2004 | Time: 14:30 | Confidential: No |

Facility: DCC, Delaware Correctional Center                    Followup Required :No

Associated Disciplinary Report #(s) 1006735

Incident Location: Bldg.17 B Tier

Location Description: Outside BL1 Cell

Violated Conditions: 2.03/200.106 Creating a Health, Safety or Fire Hazard
                     2.10/200.213 Lying

Description of Incident:

On the above date and approximate time while doing a tier check on B Wing, RP and W1 noticed feces and urine laying on the floor outside of BL1 cell. the feces and urine appeared as if they were thrown out of BL1 cell by S1. RP asked S1 why he threw it out of his cell, and S1 replied "I didn't do it, I had nothing to do with it." RP then asked S2 if he threw the feces and urine, and he replied "No, S1 threw it out of his cell." S1 then volunteered to clean the feces and urine up off the floor.

| Injured Persons | Hospitalized | | Nature Of Injuries |
|---|---|---|---|
| N/A | N/A | N/A | |

Evidence Type: N/A                                    Date Collected: N/A

Discovered By :N/A                          Secured By: N/A

Type of Force Used [ ]   PHYSICAL  [ ]   CHEMICAL [ ]   STUN [ ]   OTHER  [ ]   CAPSTUN [X]   NONE

Restraints Used    : Handcuffs and shackles

Immediate Action Taken:
      ...fied and 404 and 122 written

| Individuals Involved | | | |
|---|---|---|---|
| Person Code | Name | SBI# | Title |
| Staff | Jerry, Hayman N II | N/A | Correctional Officer |
| Inmate | Tyrone, Guinn L | 00375731 | N/A |
| Inmate | Gregory, Summers W J | 00252331 | N/A |
| Staff | Michael, Malloy F | N/A | Correctional Officer |

Reporting Officer: Hayman, Jerry N II(Correctional Officer)     Entered By: Hayman, Jerry N II(Correctional Officer)

| Approval Information | | |
|---|---|---|

[ X ]  Approved [  ] Disapproved  Date: 01/17/2004  Approved by: Mccreanor, Michael   (Shift Commander - Large Inst.)

Comments: N/A



DEPOSITION
EXHIBIT
D-1
1-17-06   VB

# EXHIBIT 2

Incident#
1010086

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone#: 302-653-9261**

Date: 05/10/2006

## INCIDENT REPORT

| Group#: N/A | Type: Inmate Involved | Incident Date: 03/12/2004 | Time: 10:30 | Confidential: No |
|---|---|---|---|---|

**Facility:** DCC  Delaware Correctional Center                    Followup Required :No

**Incident Location:** Bldg.18 C Tier

**Location Description:** upper 10

**Violated Conditions:** 2.04/200.107 Damage or Destruction Under $10

2.06/200.108 Failing to Obey an Order

2.13/200.111 Possession of Non-Dangerous Contraband

**Description of Incident:**

On the above date time location I Sgt. Edward Rutkowski and c/o Joshua Lloyd conducted a shackdown on I/m Tyrone Guinn#00375731 cell. I did observe that I/m had written with pen on his cabinet doors gang related pictures and words. I/m had also scratched onto his door more gang related things.  c/o Lloyd than found 4 pages in his cell that contained crypt writting. He than turned the pages over to Joe Richardson (I.A.) where he interviewed him and took pictures of the inmate as well as his cell. I/m Guinn was than ordered to remove the writtings from his doors but he refused to do so. I/m than was notified he would recieve a write up.

| Injured Persons | Hospitalized | Nature Of Injuries |
|---|---|---|
| N/A | N/A    N/A | |

**Evidence Type:** writting on door and cabinet                    **Date Collected:** 03/12/2004

**Discovered By :** Joshua, Lloyd                    **Secured By:**  N/A

**Type of Force Used** [ ]    PHYSICAL    [ ]    CHEMICAL [ ]    STUN [ ]    OTHER  [ ]    CAPSTUN [X]    NONE

**Restraints Used**     : handcuffs and shackles

**___ate Action Taken:**

incident report written

| Individuals Involved | | | |
|---|---|---|---|
| Person Code | Name | SBI# | Title |
| Staff | Edward, Rutkowski S | N/A | CO Corporal/Sgt. - Large Inst. |
| Staff | Joshua, Lloyd | N/A | Correctional Officer |
| Inmate | Tyrone, Guinn L | 00375731 | N/A |

**Reporting Officer:** Rutkowski, Edward S (Correctional Officer)    **Entered By:** Lloyd, Joshua (Correctional Officer)

| Approval Information |
|---|

[ X ]    Approved [ ]    Disapproved    **Date:** 03/13/2004    **Approved by:** Reynolds, Kirk  (Shift Commander - Large Inst.)

**Comments:** inmate refered to MAB



DEPOSITION
EXHIBIT
$D$-$2$
11-17-06  V/B

# EXHIBIT A
# (cont' 1)

# EXHIBIT 3

ent#
13325

## INCIDENT REPORT

| G    #990 | Type: Inmate Involved | Incident Date: 06/30/2004 | Time: 19:10 | Confidential: No |
|---|---|---|---|---|

**Facility:** DCC  Delaware Correctional Center                    **Followup Required :** No

**Incident Location:** Bldg.19 D Tier

**Location Description:**

**Violated Conditions:** 1.02/200.201 Assault

1.06/200.203 Disorderly or Threatening Behavior

1.18/200.218 Possession of Dangerous Contraband

2.03/200.106 Creating a Health, Safety or Fire Hazard



DEPOSITION
EXHIBIT

D-3

11-17-06

**Description of Incident:**

On 6/30/04 at approx. 1710 in bldg. #14-A chow hall while supervising Pretrial inmates I (Rispoli) was radio'ed by Officer Kitching directing me to contact bldg. #19 A.S.A.P. I phoned bldg. #19 and Officer Stevens reported that I/M Guinn threw human waste all over Officer Shannon. Stevens received three cuts on his right hand when he scuffled with I/M Guinn trying to subdue him. I told Stevens that I was on my way over. Capt. McCreanor radio'ed me telling me he was on his way to #19. I was releived in #14-A about five minutes later and I reported directly to bldg. #20 where I observed Capt. McCreanor, Sgt. Phillips and Officer Shannon escorting I/M Guinn out of #19 to #20. I then accompanied them to bldg. #18 where I/M Guinn was transferred to CL2 Isolation. I/M Guinn reported to me that he was not trying to throw human waste on Officers that he meant to throw it on I/M Ernest Hill. Sgt. Phillips confirmed this. I/M Guinn was strip searched in isolation and seen by Nurse Michelle Staats. Staats reported that Guinn was fine that he did not have any bumps, bruises or scratches.
Sgt. Phillips photographed Officer Stevens injuries and the wall and floor where human waste was splattered.
Officers Stevens and Shannon sent home to shower and change clothes. Stevens seen by Nurse Staats in the SHU.

| | Injured Persons | Hospitalized | | Nature Of Injuries |
|---|---|---|---|---|
| N/A | | N/A | N/A | |

    e Type: N/A                                         **Date Collected:** N/A

**Discovered By :** N/A                          **Secured By:** N/A

**Type of Force Used** [ ]   PHYSICAL   [ ]   CHEMICAL [ ]   STUN [ ]   OTHER   [ ]   CAPSTUN [X]   NONE

**Restraints Used**   : N/A

**Immediate Action Taken:**
I/M Guinn transferred from #19 DL9 to #18 CL2 Isolation.

| Individuals Involved | | | |
|---|---|---|---|
| **Person Code** | **Name** | **SBI#** | **Title** |
| Staff | Ronald, Kitching | N/A | Correctional Officer |
| Staff | Michele, Staats | N/A | Contractors - Medical |
| Staff | David, Phillips | N/A | CO Corporal/Sgt. - Large Inst. |
| Staff | Malcolm, Shannon | N/A | Correctional Officer |
| Staff | Neil, Stevens A | N/A | Correctional Officer |
| Staff | Michael, Mccreanor | N/A | Shift Commander - Large Inst. |
| Staff | Marcello, Rispoli T | N/A | Staff Lt./Lt |
| Inmate | Ernest, Hill L | 00350002 | N/A |
| Inmate | Tyrone, Guinn L | 00375731 | N/A |

**Reporting Officer:** Rispoli, Marcello T (Staff Lt./Lt)          **Entered By:** Rispoli, Marcello T (Staff Lt./Lt)

| Approval Information |
|---|

[ X ]  Approved [  ] Disapproved  Date: 06/30/2004  **Approved by:** Mccreanor, Michael  (Shift Commander - Large Inst.)

nts: Risk Assesment Form and Use of Force Form will be completed on Thursday, July 1.
Mr. Hosterman, On Call Person, notified.
D/W Burris notified.

**DCC  Delaware Correctional Center**
Smyrna Landing Road
**SMYRNA DE, 19977**
Phone#: 302-653-9261

Date:  05/10/2006

inci  nt#
1013325

## INCIDENT REPORT

| Gr   #: 990 | Type:  Inmate Involved | Incident Date: 06/30/2004 | Time: 19:10 | Confidential: No |
|---|---|---|---|---|

I/M Transferred to SHU Isolation and examined by Nurse Staats.
Officer Stevens treated by DCC medical staff and sent home to shower and change clothes. Officer Shannon sent home to shower and change clothes. Both Officers returned to the institution and finished the shift.

| Incident# | DCC  Delaware Correctional Center | Date: 05/10/2006 |
|---|---|---|
| 1013326 | Smyrna Landing Road | |

Smyrna Landing Road
SMYRNA DE, 19977
Phone#: 302-653-9261

## INCIDENT REPORT

| Gr...p#: 990 | Type: FYI | Incident Date: 06/30/2004 | Time: 17:00 | Confidential: No |
|---|---|---|---|---|

**Facility:** DCC  Delaware Correctional Center                    Followup Required :No

**Incident Location:** Bldg.19 D Tier

**Location Description:**

**Violated Conditions:**

**Description of Incident:**

On 6/30/04 at approx. 1700 in bldg. #19 on D tier a hand held talk about radio (motorola) #T5620 was damaged when I/M Guinn threw human waste on Officer Shannon. Radio has human waste on it. Radio turned over to shift commander. This brings the 4-12 shifts radio count down to 5 in bldg. #19. Radio was cleaned off but human waste is deep into the speaker.

| Injured Persons | Hospitalized | | Nature Of Injuries |
|---|---|---|---|
| N/A | N/A | N/A | |

**Evidence Type:** N/A                                            **Date Collected:** N/A

**Discovered By :** N/A                              **Secured By:** N/A

**Type of Force Used** []    PHYSICAL    []    CHEMICAL []    STUN []    OTHER    []    CAPSTUN [X]    NONE

**Restraints Used**    : N/A

**Immediate Action Taken:**

This report.

| Individuals Involved | | | |
|---|---|---|---|
| Person Code | Name | SBI# | Title |
| | Malcolm, Shannon | N/A | Correctional Officer |
| St... | Marcello, Rispoli T | N/A | Staff Lt./Lt |
| Inmate | Tyrone, Guinn L | 00375731 | N/A |

**Reporting Officer:** Rispoli, Marcello T (Staff Lt./Lt)              **Entered By:** Rispoli, Marcello T (Staff Lt./Lt)

| Approval Information | |
|---|---|

[X]    Approved [ ]    Disapproved   **Date:** 07/01/2004   **Approved by:** Mccreanor, Michael   (Shift Commander - Large Inst.)

**Comments:** N/A

# EXHIBIT 4

DELAWARE DEPARTMENT OF CORRECTION
RECLASSIFICATION FORM (WOMEN AND MEN)

FORM = 901

OFFENDER NAME  Quinn, Tyrone          SBI# 375731  DOB 11/12/84  DATE 3/18/03
　　　　　　　　　LAST　　FIRST　MIDDLE INITIAL

INSTITUTION:  DCC                     Prior Classification Date  11/12/02

CURRENT SECURITY: ___ Community/Minimum    ___ Minimum    ___ Medium    ✗ Maximum

SENTENCE LENGTH: 4:31 -  EFF. DATE: 4:6:01  STRD: 2/13/05  PED: ___  TIS ✗  NON-TIS. ___

---

### RISK REASSESSMENT

SEVERITY OF CURRENT OFFENSE FOR WHICH INCARCERATED  Current Offense include other State, if applicable) __A D F__
Low Severity .................................................................................................................................0
Moderate Severity ..........................................................................................................................2
High Severity ..................................................................................................................................4     4
Highest Severity..............................................................................................................................6

OTHER OFFENSES/BAIL STATUS                    Other Offenses(s)/Bail Amount:    None
None or pending probation violation, outstanding misdemeanors, or bail below $5,000 ..................................0
Active Federal, including Immigration and Naturalization Service and/or State warrant or charge(s) with bail of 5,000 to $49,999..2     0
Pending charges without bail (not a bailable offense, include Violation of Parole) or bail of $50,000 or more ....................4

ESCAPE/FAILURE TO APPEAR (FTA) HISTORY        Escape History: Att. Escape 2nd  12/99 - Juvenile
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(date and type/class)
None or one or more incidents of FTA (capias issued) or military AWOL ...................................................0
Walk-off from work release, furlough, Delaware Psychiatric Center, community and/or outside job assignment, courtrooms,
police (city, state, military. etc.), Recovery Center within the past 3 years......................................................2
Attempted escape from a secure correctional institution within the past five years or escape from a secure facility ten + years ago
.........................................................................................................................................................3     0
Escape from a secure correctional institution within the past ten years .......................................................5

CURRENT AGE                                   Current Age:  18
Age 39+ ...........................................................................................................................................0
Age 23 years or less .........................................................................................................................1
Age 28-38 ........................................................................................................................................2     1
Age 24 - 27 ......................................................................................................................................3

SEVERITY OF CRIMINAL HISTORY IN THE LAST 5 YEARS   Most Serious Prior Conviction (include Level I-IV, other States): 1st Adult Conv
No prior conviction ...........................................................................................................................0
Low Severity conviction ....................................................................................................................0
Moderate Severity conviction.............................................................................................................2     0
High Severity conviction ...................................................................................................................3
Highest Severity conviction ...............................................................................................................4

NUMBER OF CLASS I/MAJOR DISCIPLINARY FINDINGS OF GUILT (since initial or last regular reclassification)  One
None ...............................................................................................................................................0
1 Disciplinary Finding of Guilt ...........................................................................................................2
2 - 3 Disciplinary Findings of Guilt .....................................................................................................3     2
4+ Disciplinary Findings of Guilt ........................................................................................................5
　　　Actual Number of Class I Disciplinary Findings: _____

INSTITUTIONAL MISCONDUCT HISTORY (Consider institutional reports during last 5 years.)
First incarceration or no prior Major/Class I Institutional Reports..............................................................0
Major/Class I - Non Predatory Institutional Misconduct Report ≥ 37months ...............................................1
Major/Class I - Non Predatory Institutional Misconduct Report within last 36 months
　or Predatory/Assaultive ≥ 37mths................................................................................................3
Major/Class I - Predatory/Assaultive Institutional Misconduct Report w/in 13 - 36 months.............................5     7
Major/Class I - Predatory/Assaultive Institutional Misconduct Report within past 12 months............................7
　　　Most Serious Institutional Misconduct Report: _____ DTB_____
　　　Date of Most Serious Misconduct Report: _____ 11/12/02_____

DEPOSITION
EXHIBIT
D-4
11-17-04  1/R

PERFORMANCE IN TREATMENT PROGRAMS/WORK ASSIGNMENTS          Progr   Status: _____

Completed all recommended program(s) AND is currently working....................................................................-2
Completed some programs, is working and on waiting list for other recommended programs ...........................-1
Enrolled in recommended program or no treatment recommended and is working ...........................................0
Medically discharged/excused or successfully completed all recommended programs....................................0
On waiting list for recommended program and work, due to lack of availability .................................................0
Dropped out or failed to complete or was dismissed from program and/or work prior to completion ...................2
Unsuccessful (refused work and/or program participation)...............................................................................3

RISK REASSESSMENT SCORE: _14_

RISK ASSESSMENT SCALE:

| | Community/Minimum -02 to 04 | Minimum 05 - 08 | Medium 09 - 16 | Maximum 17 or more |
|---|---|---|---|---|

Preliminary Security Level (Check scored security level)

____ Community/Minimum          ____ Minimum          _✓_ Medium          ____ Maximum

OVERRIDES:

Any one of the conditions listed below may serve as basis for an override, resulting in higher or lower security than indicated by the preliminary score. (Check all that apply and comment as deemed appropriate.)

____ Protective Custody or Need for separation from General Population: _____

____ Documented membership in security threat group _____

____ Pending institutional reports under investigation _____

____ Notorious/high profile case _____

____ Mental Health: _____

____ Physical/Medical limitations that could affect housing placement _____

____ Court Order: _____

____ Time to Serve: _____

_✗_ Other (specify): Serious pattern of negative behavior - Rec'd several write-ups for throwing urine and feces at MPCJF. Continued neg behavior here - When approached for A/ST

Recommended Security Level (Check recommended security level.)

____ Community/Minimum     ____ Minimum     ____ Medium     _✓_ Maximum   I'm asked 2x's "What the fuck do you want."

*[signature]* Correctional Worker          Date 3/17/03

Comments: I'm I'm Tyrone Quinn appears appropriate confined, but I'm Quiny has a serious pattern of negative behavior

Final Security Level (Check appropriate security level)

____ Community/Minimum     ____ Minimum     ____ Medium     ____ Continue Medium - MPO     ____ Maximum

_____     _____
Classification Officer/Unit Supervisor (signature required for overrides; optional for other decisions)          Date

NOTE: Classification Officer/Unit supervisor may change recommendation of classification worker, but must provide written justification.

Comments: _____

Housing Assignment: _____     Next Classification Date: _____
                                                                                    (month and year)

*Program Assignment(s): _____

*Work Assignment: _____

*Changes: _____

FORM # CC1-A

# EXHIBIT 5

**FORM #584**

**GRIEVANCE FORM**

DEPOSITION
EXHIBIT
D-5
11-17-06 VB

CILITY: DCC TIX                    DATE: JULY 28, 04

GRIEVANT'S NAME: Tyronee Guinn    SBI#: 315731

CASE#: Inmate Not Recived State Item    TIME OF INCIDENT: 8 to 4 Site.
Items.

HOUSING UNIT: SHU: 17 BCq

5584

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED
IN THE INCIDENT OR ANY WITNESSES.

On Feb. 24 04 I Put IN a Item Request form
for Cloth's In Since I havin Rocived any of the
Items Yet. and It's Been over 8 months then I
Sent another Letter on April 1st and Still having
got any of the Need Items. I order 3 Tshirts 2x
3 undde wear 2x 3 sock's and Towl with a Washclth
and white shoes Size D.

ACTION REQUESTED BY GRIEVANT: I Repectfully ask By Grievance Altion
Requested to Have a Invetegation Done on the Clothin
Requested off.ce to see what's going on with Inmate
Not Reciven "Need" Item. Becase It's Been foe ar
over 9 month's IN I Don't have any of these Items above.

GRIEVANT'S SIGNATURE: Tyronee Guinn    DATE: July 28 04

WAS AN INFORMAL RESOLUTION ACCEPTED? _____(YES) _____(NO)

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE:_____    DATE:_____

IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.

cc: INSTITUTION FILE
    :RIEVANT

April '97 REV

RECEIVED

AUG 0 2 2004

Inmate Grievance Office

# EXHIBIT A
# (cont' 2)

# EXHIBIT 6

CASE#: 4878      TIME OF INCIDENT: 7-2-04

HOUSING UNIT: C- 24HU 18

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED
IN THE INCIDENT OR ANY WITNESSES.

I was placed in Isolation under strip cell conditions
when I was not a threat to myself or been classified or
recommended by Mental Health personnel after being seen and
determined to be a threat to my life. I never said I was going
to harm myself and if I did mental health would had to see
me and determine if I should be kept under suicide status
and stripped of my clothing etc. The condition that I was
placed is against the law as a law suit was filed on
an exact practice and was considered Cruel & Unusual
punishment.

ACTION REQUESTED BY GRIEVANT: That I be given the blanket, Sheet
and clothing that I am entitled of.

GRIEVANT'S SIGNATURE: _____ DATE: 7-02-04

WAS AN INFORMAL RESOLUTION ACCEPTED? _____(YES) _____(NO)

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE: _____ DATE: _____

IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.

... INSTITUTION FILE
    GRIEVANT



DEPOSITION
EXHIBIT
D-6

ENG&D 800-631-6989

April '97 REV

RECEIVED

JUL 0 8 2004

Inmate Grievance Office

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitte within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

## Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language.** The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

___✓___ **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed..    __✓__ Disciplinary Action     _____ Parole Decision     _____ Classification Action

_____ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s).** This issue has been addressed previously in Grievance #_____.

_____ **Original Grievances must be submitted to the Inmate Grievance Chairperson.** Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

_____ **Expired filing period.** Grievance exceeds seven(7) days from date of occurrence.

_____
Inmate Grievance Chairperson

JUL 0 8 2004

Form#:  584 (F&B)
(Reverse Revised July '99)

# EXHIBIT B

Incident#
1013325

**DCC  Delaware Correctional Center**
Smyrna Landing Road
**SMYRNA DE, 19977**
Phone#: 302-653-9261

Date: 07/01/20

## INCIDENT REPORT

Group#: 990        Type: Inmate Involved        Incident Date: 06/30/2004        Time: 19:10        Confidential: No

Facility: DCC  Delaware Correctional Center        Followup Required : No

Incident Location: Bldg 19 D Tier

Location Description:

Violated Conditions: 1.06/200.203 Disorderly or Threatening Behavior
1.02/200.201 Assault
1.18/200.218 Possession of Dangerous Contraband
2.03/200.106 Creating a Health, Safety or Fire Hazard

Description of Incident:

On: 6/30/04 at approx. 1710 in bldg. #14-A chow hall while supervising Pretrial inmates I (Rispoli) was radio'ed by Officer Kitching directing me to contact bldg. #19 A.S.A.P. I phoned bldg. #19 and Officer Stevens reported that I/M Guinn threw human waste all over Officer Shannon. Stevens received three cuts on his right hand when he scuffled with I/M Guinn trying to subdue him. I told Stevens that I was on my way over. Capt. McCreanor radio'ed me telling me he was on his way to #19. I was relieved in #14-A about five minutes later and I reported directly to bldg. #20 where I observed Capt. McCreanor, Sgt. Phillips and Officer Shannon escorting I/M Guinn out of #19 to #20. I then accompanied them to bldg. #18 where I/M Guinn was transferred to CL2 Isolation. I/M Guinn reported to me that he was not trying to throw human waste on Officers that he meant to throw it on I/M Ernest Hill. Sgt. Phillips confirmed this. I/M Guinn was strip searched in Isolation and seen by Nurse [redacted] Staats reported that Guinn was fine that he did not have any bumps, bruises or scratches.
Sgt. Phillips photographed Officer Stevens injuries and the wall and floor where human waste was splattered.
Officers Stevens and Shannon sent home to shower and change clothes. Stevens seen by Nurse [redacted] the SHU.

| Injured Persons | Hospitalized | | Nature Of Injuries |
|---|---|---|---|
| N/A | N/A | N/A | |

→ Evidence Type: N/A ←        Date Collected: N/A

Discovered By : N/A        Secured By: N/A

Type of Force Used: [ ]    PHYSICAL    [ ]    CHEMICAL [ ]    STUN [ ]    OTHER [ ]    CAPSTUN [X]    NONE

Restraints Used    : N/A

Immediate Action Taken:
I/M Guinn transferred from #19 DL9 to #18 CL2 Isolation.

### Individuals Involved

| Person Code | Name | SBI# | Title |
|---|---|---|---|
| Staff | Marcello, Rispoli T | N/A | Staff Lt./Lt |
| Staff | Michael, Mccreanor | N/A | Shift Commander - Large Inst. |
| Staff | Neil, Stevens A | N/A | Correctional Officer |
| Staff | Malcolm, Shannon | N/A | Correctional Officer |
| Staff | David, Phillips | N/A | CO Corporal/Sgt. - Large Inst. |
| Inmate | Tyrone, Guinn L | 00375731 | N/A |
| Inmate | [redacted] | 00350002 | N/A |
| Staff | [redacted] | N/A | Contractors - Medical |
| Staff | Ronald, Kitching | N/A | Correctional Officer |

Reporting Officer: Rispoli, Marcello T (Staff Lt./Lt)        Entered By: Rispoli, Marcello T (Staff Lt./Lt)

### Approval Information

[ X ] Approved    [ ] Disapproved    Date: 06/30/2004    Approved by: Mccreanor, Michael  (Shift Commander - Large Inst.)

Comments: Risk Assesment Form and Use of Force Form will be completed on Thursday, July 1.
Mr. Hosterman, On Call Person, notified.
D/W Burris notified.

# EXHIBIT C

Wednesday, June 30, 2004 4x10-L-N1.

1713  CR 2 - Gunn, Tyrone in - CPT. McCreanor, LT.  08
Rispoli & Back-up out @ 1725.  08
1719  Rover & Nurse on C wing for check-up of CR 2 @ 1723  09

D00639

(continued) — 8×4 Thursday 7/1/04
if
to
e; LT.

Δ2°e 1923 (complete) 0915 I/M Gwinn Tyrone ☐SBI# 395731 To Bldg 20
0945 I M Gwinn Patchen

: 2023

Staff: Thursday July 1 2004 4×12
C/o Michelle Phillips C/O pod with C/o
Ø out / William Naples & C/o Doug Walrabenstein
on O.T. on C/o Floor

D·17

D out LE: Note: No Showers to be used tonight
— due to Water Shortage – per Primary.
- Note: Due to Lightning I/m's moved from
— outside yd to inside yd.

Na

[ont July 1 2004    4x12 (Thursday)    (cont.)

Friday    July 2, 2004    0800-1600  290188
%o W Pritchett    s/d Pod    163986
%o K. Blankship    ? %o Butler    s/d Floor  159858
                                              246639

0528  CL2| Guinn. T  to Class 2 → 0557 secured

:le c/^- ^a (AP comp^^ CONFISCATE MARI. 07/05/04 4·12

1649 CL2 BROUGHT OUT forward. RETURNED 1418

iverill

D00646



73

Wednesday July 7, 2004 4x12 shift (continued)

1901   Clo - eyds → rubb w@. 1835

1748  Laundry pass out on D. wig, p/p complete; sheets & pillow cases
1800  Laundry passed out on C wing p/p complete

D00650

74

GARDEN & SNEAD on Flwr

THRU 7/8/04. CPL E.E. MORTON on Duty

1420 T. QUAN TO LT SAVAGE C.ENT. REV 1470

D00651